IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,     : | |
| : | Case No. CR2-06-109 |
| Plaintiff,     : | |
| : | |
| v.     : | JUDGE ALGENON L. MARBLEY |
| : | |
| : | |
| ALEXIS DUKES,     : | |
| : | |
| Defendant.     : | |

## ORDER AND OPINION

### I. INTRODUCTION

This matter comes before the Court on the Motion to Suppress Evidence by Defendant, Alycia Dukes ("Defendant"). For the reasons set forth herein, the Court **GRANTS** Defendant's Motion to Suppress.

### II. STATEMENT OF FACTS

#### A. Background

#### 1. Lead-Up to Traffic Stop

On April 11, 2006, at approximately 4:00 p.m. Ohio State Highway Patrol ("OSHP") Trooper, R.J. Jacks ("Jacks") stopped Defendant for alleged traffic violations she made while traveling eastbound on U.S. 35 at or near Mile Post 4 near the Rio Grande exit. U.S. 35 is a four-lane divided highway, and the speed limit in that area is 65 miles per hour for cars, and 55 miles per hour for semis. *Id.* at 3.

During the May 31, 2006 suppression hearing, Jacks relayed the following facts about the

traffic stop. On April 11, 2006, Jacks and two other State Troopers, Mark Ball ("Ball") and Stoney Johnson ("Johnson"),[1] each in his own vehicle, were positioned in a crossover at Mile Post 4 on U.S. 35. *See* Hrg. Tr. at 8. Jacks and Ball were monitoring eastbound traffic, and Johnson, facing the opposite direction, was monitoring westbound traffic. *Id.* Jacks asserts that as he monitored traffic, he observed "a vehicle probably half a mile to three quarters of a mile away, in the left-hand lane, passing a semi," that had suspiciously slowed its speed, eventually pulling back in behind the semi. *See* Hrg. Tr. at 9. He pointed the vehicle out to Ball, and said, "[w]atch that car." *Id.*

Using a laser, Ball checked the vehicle's speed three times as it approached, and it registered at about 53 miles per hour. Hrg. Tr. at 9. Jacks continued to monitor the vehicle, and as the vehicle drove by, Jacks and Ball assessed the behavior of the vehicle's driver, Defendant. Jacks asserts that, "[a]s she drove by, I noticed that she didn't look over at us. She seemed extremely tight. She was – her hands were locked at the "ten and two" position on the steering wheel, leaned up on the steering wheel, staring straight ahead as she went by." *Id.* at 11. Jacks found this behavior "suspicious," and, after a brief discussion with Ball, he decided to follow her to "see if [he] could observe any more unusual driving behaviors and also any kind of offenses that we might stop her for." *Id.* at 15.

Jacks left the crossover and caught up with Defendant. Hrg. Tr. at 16. He noticed that Defendant was "weaving in her lane," and he felt that "maybe she [was] watching [him] in her mirror." *Id.* Defendant, however, never drove outside of her lane, and, at all times, she continued to drive "unusually slow[ly]." *Id.* Jacks then "decided to pull up beside of her, just to look, take a look at her to see, you know, if I could see anything, if she would look over at me, what her behavior

---

[1] Trooper Ball and Trooper Johnson are "district 9 canine handlers." *See* Hrg. Tr. at 8.

was when I pulled up beside of her." *Id.* at 17. Upon doing so, however, Defendant kept her eyes on the road, and, according to Jacks, she "looked exactly the same as when she drove by me [before] . . . She's still locked on the steering wheel, staring straight ahead. I pulled up beside her. I'm looking at her through my side glass. She never glances over at me, just kept driving." *Id.*

Shortly after he had pulled up beside Defendant, Jacks asserts that Defendant committed three traffic violations. First, Defendant "followed too closely" to a semi. In this instance, Jacks explained that Defendant followed to closely :

> [w]ell, the semi – where we live, or where I work, it is rolling hillsides, for the most part, and the semis really struggle on the grades, especially if they can't get a little bit of speed up to get up the hill, which just – the semi that was in front of her couldn't because he was probably afraid to speed because there was a trooper back there. So, when he reaches the grade, he gets on the grade. So he starts dropping speed because he can't hold the hill. So he drives – I think it's right around 50 miles an hour. He slows down, below the speed limit. Her speed is varying. So she eventually catches up with him on this hill and gets within two car lengths, or probably 45 to 50 miles an hour, as he's going up the hill, but as soon as we top the grade, the semi pulls away again. He's out of there. So, it didn't last as long as I would like for . . . a following-too-close violation. So I decided I had to head to West Virginia to develop probable cause. So I decided just to let it go on to see what else had happened, if there was anything else I needed to do.

Hrg. Tr. at 18. Shortly thereafter, Jacks asserts that Defendant committed a second traffic violation by changing lanes without signaling. He stated, "[Defendant] moved over into the left lane to yield the right of way to this truck [merging left onto U.S. 35 from the rest area]. When she did that, she got into the left lane. She used her turn signal but not until she was already into the left lane." *Id.* at 19-20. Then, after the merging semi picked up speed, Defendant merged back behind it, and Defendant, following behind the semi, was again following too closely. *See id.* at 20. Jacks asserts that at this point, he decided to stop Defendant in order to "educate" her. *See* Hrg. Tr. at 22.[2] Jacks

---

[2]During the suppression hearing, upon the Court's inquiry as to whether Jacks typically gives drivers tickets for "following too closely," he asserted "No your honor. Usually I stop and

-3-

ran Defendant's license plate through the in-car computer, revealing that the vehicle was registered to West Virginia resident, Kevin Moore. Jacks then notified the dispatcher that he was going to "be stopping the vehicle just east of 850." *See id.* at 22.

### 2. Traffic Stop[3]

Based on his observations of Defendant's alleged traffic violations, at approximately 4:00 p.m., Jacks initiated a traffic stop of Defendant on U.S. route 35 southbound at Milepost 11 in Gallia County, Ohio. Unit 1509, Jacks' cruiser, is equipped with a cruiser video system, and a videotape of the stop and arrest was made. A review of the videotape reveals the following.

| Time | Event |
|---|---|
| 1600:29 | Tape begins |
| 1600:40 | Jacks pulls over Defendant's vehicle. |
| 1600:54 | Jacks approaches the passenger side of the vehicle, and asks Defendant to open up her door. |
| 1600:00 | **Jacks:** "The reason why we stopped ya' is because when you drove by us you was going' about 50 mile an hour, we thought maybe you was gonna exit back there."<br>- Defendant advises Jacks that she was driving slowly because she was eating, and she points to a "Dairy Queen" bag in her car.<br>- Jacks seizes a bag of french fries from the front seat of Defendant's car. |
| 1601:04 | **Jacks:** "Is that what you were doing? OK. We thought maybe you were impaired, you were goin' so slow." |
| 1601:10 | Jacks asks for driver's license, proof of insurance, and registration.<br>* According to Jacks he immediately noticed signs of extreme nervousness on the part of the Defendant. |
| 1601:16 | **Jacks:** Headin' back to West Virginia?<br>**Defendant:** Yes, sir.<br>**Jacks:** What part of West Virginia do you live in? |
| 1601:19 | **Jacks:** Whose vehicle is this, M'am? |

educate them." *See* Hrg. Tr. at 22.

[3]Though there is video footage of the traffic stop in question, in its Response, the government notes that it disagrees with parts of Defendant's account of the traffic stop in her Motion to Suppress. The Court has highlighted any significant factual discrepancies with a "*".

-4-

|  |  |
|---|---|
|  | - Defendant advises Jacks that the car belongs to her friend Kevin, and that he allowed her to use it.<br>* According to Jacks, she indicated to him that the vehicle belonged to a "friend of a friend."<br>- Defendant provides Jacks with valid vehicle registration. |
| • 1601:33 | **Jacks:** What took you to Columbus? |
| • 1601:48 | **Jacks:** Oh you went to Cleveland? I thought you said you went to Columbus.<br>* According to Jacks, after she had indicated that she was traveling to Columbus, she told him that she was visiting her aunt in the Cleveland Clinic. When he noted that the Cleveland Clinic is not in Columbus, she told him that she had gone to Cleveland first, and then to Columbus for "hair care products." |
| • 1602:05 | **Jacks:** What's in that plastic bag in your purse?<br>* Jacks asserts that when Defendant opened her purse to retrieve her driver's license, he observed a plastic bag with an observable amount of marijuana residue inside it inside her purse. He notes that though the amount of marijuana in the bag was small, Defendant's claim that the bag was "empty" is false. Accordingly, Jacks contends that he did not search Defendant's vehicle based solely on odor.<br>**Dukes:** Nothing.<br>- Defendant claims that the bag was empty. |
| • 1602:10 | Jacks reaches into the car, and takes the baggy from Defendant.<br>- Defendant claims that Jacks seized the empty baggy from her purse without her consent.<br>* According to Jacks, Defendant "handed him" the bag, and when he examined it, he could both see and smell marijuana. |
| • 1602:16 | **Jacks:** You had some marijuana in here?<br>**Dukes:** No, sir. I didn't have it.<br>**Jacks:** Somebody did.<br>* Jacks also asserts that initially, Defendant denied that the bag was hers, but eventually, she stated that though she had not had any marijuana that day, she had smoked some the previous day.<br>**Dukes:** I haven't had any today.<br>**Jacks:** Let me see your driver's license there<br>- Jacks takes Defendant's driver's license and puts it in his pocket. Jacks orders Defendant out of the vehicle. |
| • 1602:37 | **Jacks:** Just leave your purse right there. |
| • 1602:40 | Defendant and Jacks between Defendant's vehicle and Jacks' cruiser. |
| • 1602:41 | **Jacks:** I'm not takin' you to jail, but I want to make sure ya got |

|   |   |   |
|---|---|---|
|   |   | nothin' else illegal in the car.<br>- Jacks reads Defendant her *Miranda* rights.<br>\* Jacks asserts that he read her her *Miranda* rights because after he saw the marijuana, he planned to question her about other drugs that could be present in the car. |
| • | 1602:53 | *Miranda* warnings completed. |
| • | 1602:54 | Jacks continues to interrogate Defendant about her travels. |
| • | 1604:05 | **Jacks:** The reason why we work this [road] so hard is that we get a lot of drugs comin' from. . . |
| • | 1604:21 | **Jacks:** Now here's what I'm gonna tell ya; I've already got enough here to search the car, and I am gonna search the car. . . |
| • | 1605:28 | Jacks pats Defendant down. |
| • | 1605:40 | **Jacks:** When was the last time you smoked marijuana, Ma'm.<br>**Dukes:** Yesterday. |
| • | 1605:45 | Defendant locked in back seat of cruiser.<br>\* Jacks asserts that before he placed her in his cruiser, Defendant had indicated that to her knowledge, there was no contraband in her car.<br>**Jacks:** Mark,[1] I'm gonna search this car. |
| • | 1606:06 | Jacks recites the reason for his search to another officer offscreen. |
| • | 1606:07-1626-18 | Vehicle search resulting in seizure of drugs from truck.<br>\* Jacks asserts that he discovered approximately 755 grams of cocaine in her trunk under the floor near the spare tile well along with sheets for drying clothing and packaging material. Defendant denied any knowledge of the contraband, and Jacks placed her under arrest and handcuffed her. |
| • | 1626:19 | Cruiser leaves scene in transit to jail. Defendant was not cited for any of the alleged traffic violations. |
| • | 1631:22 | End of video. |

### B. Procedural History

On or about April 11, 2006, the Grand Jury in the Southern District of Ohio indicted Defendant on two charges: (1) one charge of knowingly and intentionally unlawfully possessing with intent to distribute 400 plus grams of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(ii); 18 U.S.C. § 2; and (2) one charge of knowingly and intentionally possessing marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 844.

---

[1]Several additional law enforcement officers are off camera.

On May 9, 2006, pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure, Defendant moved the Court for a pretrial order suppressing any and all evidence which the government may seek to introduce at trial in the case on the grounds that it was illegally seized by officers and/or agents of the Ohio State Highway Patrol. The evidence Defendant seeks to suppress consists of approximately 755 grams of cocaine acquired by the Government in Jacks' search of her vehicle. Defendant alleges that this evidence must be suppressed because it was the direct or indirect result of an unconstitutional search and seizure in violation of her rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution. The matter has been fully briefed, and the parties appeared before the Court for a suppression hearing on May 31, 2006.

### III. LAW AND ANALYSIS

Defendant asserts that the evidence seized during her arrest must be suppressed because: (1) Jacks did not have a valid reason for stopping her; (2) once the traffic stop occurred, Jacks "arrested" her without probable cause; and (3) Jacks did not have probable cause to conduct a warrantless search of her vehicle. The government opposes each of Defendant's arguments. The Court is presented with an interesting legal paradox, if not a legal anomaly: a defendant suspected of criminal activity because, while being observed by law enforcement, she complied with all traffic laws, is subjected to a probable cause stop. The question becomes whether it was legal. This Court thinks not.

The Supreme Court has held that "stopping an automobile and detaining its occupants constitute[s] a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments, even though the purpose of the stop is limited and the resulting detention is quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). An ordinary traffic stop, however, is more akin to an

"investigative detention" rather than a custodial arrest. *See Terry v. Ohio*, 392 U.S. 1 (1968).

In conducting a traffic stop, the police must either "have probable cause to believe that a traffic violation has occurred," or a "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *See Whren v. United States*, 517 U.S. 806, 810 (1996); *United States v. Sokolow*, 490 U.S. 1, 7 (1989). An officer's subjective intentions and motivations, however, are irrelevant to a Fourth Amendment analysis. *See Whren*, 517 U.S. at 813. As long as there was an objective basis for the stop, based upon either probable cause or reasonable suspicion, the dictates of the Fourth Amendment are satisfied. *See id.* (effectively foreclosing the argument that an officer's "ulterior motives" can invalidate police conduct justified on the basis of probable cause).

In the case sub judice, Jacks contends that because he observed Defendant acting suspiciously and committing multiple traffic violations, he had probable cause to conduct the initial traffic stop, which led, in turn, to the seizure of 755 grams of cocaine. According to Jacks, he initially thought Defendant was suspicious because upon passing him at Mile Post 4, she was driving below the posted speed limit, she failed to look at him, and she had her hands in the "ten and two" position on the steering wheel. Further, he asserts that he initiated the traffic stop after he had observed her commit three traffic violations – two following too closely violations, and one improper lane change violation. The Court, however, finds that Jacks' testimony regarding the initial traffic stop fails to support his assertion that he had either reasonable suspicion or probable cause to believe that Defendant had violated various Ohio traffic laws.

### A. Reasonable Suspicion

Jacks asserts that in looking for "suspicious drivers," Ohio state troopers are taught to focus

on "changes" in driver behavior.² During the suppression hearing, he testified, "[w]e focus on – when we're monitoring traffic on U.S. 35, whatever route that we may be on, we look for changes in driver behavior, abnormal behavior, something unusual that just it's, you know, it doesn't make sense . . ." *See* Hrg. Tr. at 10. Further, he noted that the Troopers look for behavior that though "alone, by itself, means nothing. . .," when combined with other certain characteristics, "paint[s] a picture"of suspicious behavior. *See id.* at 13-15.

Jacks asserts that he was reasonably suspicious of Defendant because of her allegedly "strange behavior" when he first observed her at Mile Post 4. During the suppression hearing, Jacks clarified that he found Defendant's behavior suspicious because she was driving very slowly, she did not look at the State Troopers in the cross over as she drove by, and she had her hands "locked onto" the steering wheel in the "ten and two" position. Jacks admitted that taken alone, none of these factors is illegal or suspicious, but, when combined with "several different factors, it [added] up to a problem somewhere down the road." *See* Hrg. Tr. at 11. The Court, however, finds that Defendant's actions, even when taken together, suggest "safe driving," not "suspicious activity" that rises to the level either of probable cause or of reasonable suspicion.

First, though Defendant's speed was in excess of 10 miles per hour slower than the 65 mile per hour speed limit allowed for passenger vehicles on U.S. 35, it is undisputed that she was not affecting the flow of traffic, and no law makes driving 53 miles per hour, in and of itself, either

---

²Upon cross-examination by Defendant's counsel, Jacks clarified that when he said he was looking for "changes in behavior," he meant that Ohio state troopers look for drivers who exhibit "[different behavior from the rest of the motoring public." *See* Hrg. Tr. at 70. He noted that such behavior means "that there might be something a little bit odd going on. . . We don't know what it is. . . It's geared to criminal behavior, weapons, different things, terrorists." *Id.* at 71.

illegal or improper. *See* Hrg. Tr. at 16. Indeed, Section 4511.22 of the Ohio Revised Code ("Slow speed"), reads, in relevant part, as follows:

> (A) No person shall stop or operate a vehicle, trackless trolley, or street car at such a slow speed *as to impede or block the normal and reasonable movement of traffic*, except when stopping or reducing speed is necessary for safe operation or to comply with law. . .
> (C) Except as otherwise provided in this division, whoever violates this section is guilty of a minor misdemeanor. . . .

*See* OHIO REV. CODE § 4511.22 ("Slow speed") (emphasis added).

Second, though Defendant was "locked onto the steering wheel" with her hands in the "ten-and-two" position, this is considered the "safe" and appropriate hand position taught to generations of drivers in driver education courses. During the suppression hearing, Jacks explained that there is no specific Highway Patrol "policy" that gives troopers a reason to believe that it is suspicious for a driver *not* to look at him. Therefore, despite Jacks' contentions that the above factors, when combined, were sufficient to pique his suspicion, the Court remains unconvinced. Defendant's actions – either in isolation or in combination – were not illegal or inappropriate. It is wholly unreasonable that a driver acting within the bounds of the law by driving within the speed limit, keeping her hands on the wheel in the preferred "ten and two" position, and failing to be distracted by her surroundings, may be regarded as exhibiting behavior that is suspicious of criminal activity.

### B. The Alleged Traffic Violations

As noted above, it is undisputed that routine traffic stops are constitutional where police have probable cause to believe that a traffic violation has occurred. *See Whren*, 517 U.S. at 806. Further, the Supreme Court has found that the fact that "police manuals and standard procedures may sometimes provide objective assistance," does not provide evidence that a court may speculate into the officers' intent in making a viable Fourth Amendment traffic stop. *See id.* at 815. In this case,

Jacks contends that he had probable cause to stop Defendant because she committed three traffic violations – following too closely behind a semi two separate times, and changing lanes without using her turn signal. Nonetheless, the Court finds that Jacks' testimony does not support his assertions.

First, based on Jacks' testimony, Defendant did not violate the Ohio statute relating to following too closely. Jacks testified that under the "rule of thumb" adopted by law enforcement officers, drivers should remain one-car-length distance away from the car in front of them per every ten miles an hour of speed. *See* Hrg. Tr. at 21, 76. Jacks explained that the rule is based on the principle that drivers must "maintain enough distance between vehicles so [that they] can stop in an emergency situation and not crash into the back of the vehicle" in front of them. *See id.* at 77. Under that, "rule of thumb," therefore, Dukes, traveling at approximately 50-55 miles per hour should have been a minimum of 5½ full car lengths away from the semi to be able to safely avoid a collision. *Id.*

Despite the "rule of thumb," Jacks' testified that under the circumstances, whether Defendant could safely stop "before running into the back of the truck" would depend mostly on her "reaction time." *Id.* On cross examination, Defendant's counsel elicited the following testimony from Jacks regarding Defendant's following too closely violation(s):

> **Q:** Okay. But when she – at any point in time when you observed the follow-too-close violation, her speed had decelerated, had gone below the speed of the truck. This is simple physics, is it not?
> **Jacks:** Yes. . . Yes, you're correct. When they were going up the hill, yes.
> **Q:** So, when you observed her following too close, her speed relative to the truck was slower than the truck's?
> **Jacks:** She is slowing down. No, she is actually catching up to the truck, because he's slowing down for the hill. When she runs up to the back of them, that's when she slows down.

> **Q:** So, she was decelerating, true?
> **Jacks:** Yes.
> **Q:** And if the truck then attempted to, for some reason – a deer runs across the road or anything and the truck jammed on its brakes, she would have been easily able to stop before running into the back of the truck, because she was decelerating and her vehicle weighs less than the truck and can stop in less distance. True?
> **Jacks:** I don't believe – the average reaction time is 1.5 seconds. It depends on her reaction time. I can't speak for her personal reaction time, but I don't think she would have had time to react.

*See* Hrg. Tr. at 81-82. It is notable that Jacks testified that whether Defendant had kept a reasonable distance between herself and the semi depended mostly on her "reaction time." In conceding that he did not *know* Defendant's reaction time, Jacks demonstrated that he could not be sure that under the circumstances, she was following too close.

Moreover, Jacks' "rule of thumb," does not comport with the language of the statute prohibiting following too closely, which reads as follows:

> (A) The operator of a motor vehicle, streetcar, or trackless trolley shall not follow another vehicle, streetcar, or trackless trolley *more closely than is reasonable and prudent*, having due regard for the speed of such vehicle, streetcar, or trackless trolley, and the traffic upon and the condition of the highway. . . .
> (B) Except as otherwise provided in this division, whoever violates this section is guilty of a minor misdemeanor. . . .

*See* OHIO REV. CODE § 4511.34 ("Space between moving vehicles") (emphasis added). Defendant could have complied with the above statute, despite the fact that she may not have been exactly 5 to 6 car lengths behind the semi in front of her. Further, this Court finds it irrational to hold drivers accountable to an officer's personal consideration of what is "reasonable" and/or "prudent" when the rule appears to be completely objective. In other words, if Defendant, in her own estimation, believed that, under the circumstances, she was providing enough room between herself and the semi in front of her, Jacks' opinion otherwise should not give him license to detain her, regardless of

whether that detention would be to "educate" her rather than to charge her with a violation. It is patently unfair for law enforcement officers to be able to hold drivers to a standard that differs from the standard set forth in the statute itself.

Even assuming *arguendo* that Jacks was reasonable in detaining Defendant to "educate" her about following too closely, his stated reasons for stopping her are unsupported by the record. It is notable that following her arrest, Jacks never cited Defendant for any traffic violations. He asserts that there is a "kinder, gentler" policy in place under which Troopers do not tack traffic violations onto other, more serious violations.[3] The Court notes, however, that Jacks' failure to cite Defendant further undermines his assertion that the alleged traffic violations provided him with the required probable cause to initiate a traffic stop of Defendant in the first place.

Upon initiating the traffic stop, Jacks stated, "[t]he reason why we stopped ya' is because when you drove by us you was going' about 50 mile an hour, we thought maybe you was gonna exit back there." *See supra* Part II. He admits that during the stop, he *never* mentioned anything to Defendant about her following too closely behind two different semis, or about making a lane change without using her turn signal. *See* Hrg. Tr. at 90. He asserts, however, that he informed her of these violations once they reached the station house. Further, he claims that, "there was many reasons why I stopped her, and I hadn't had the chance to – this thing happened so quick, really, with the discussion I've had, where she is going, where she is coming from, and then to the discovery of the marijuana, I never had the time to do my education part of my traffic stop." *Id.*[4]

---

[3]Tellingly, there is no written version of this alleged policy nor other objective evidence of its existence.

[4]In addition, Jacks testified that he did not immediately inform Defendant of her traffic violations in an effort to make the stop as collegial as possible. He stated:

Jacks testified that upon stopping the Defendant, he was not required to advise Defendant immediately of the reasons for the stop. That practice, however, violates Highway Patrol Regulations. Ohio State Highway Patrol Policy No. 200.06 § E.5-7 ("OSP-200.06") states that after an officer has stopped a driver in a safe location, he must:

> 5. Exit the patrol vehicle and remain alert for actions or movement within the stopped vehicle.
> 6. Maintain a position so the interior of the stopped vehicle and its occupants may be monitored.
> 7. *Inform the driver of the reason for the stop* and remain alert for any suspicious actions by the occupants.

*See* OSP-200.06 § E.5-7 (June 8, 2006) (emphasis added).[5]

---

> On every contact that I make, I try to just be as friendly as I can to people. I make it lighthearted so they're going to cooperate with me. It's a lot easier to deal with a cooperative person than it is somebody that's upset. Because, the first thing, if I say, "I stopped you because of this," they say, "I didn't do that," and they want to argue. So, I start it off lighthearted, and by the time before we could even get to the point of me explaining everything that had happened, the bag of marijuana was discovered, and it just – everything just kind of went off in a different course, and at that time – she was educated, later, at the post. . . .and that's the reason why she was not explained right from the start.

*See* Hrg. Tr. at 137-38. Taking Jacks' testimony into consideration, however, the Court does not find Jacks' excuse to be a satisfactory explanation for why he waited to inform Defendant of his reasons for stopping her. If Jacks had really wanted to start off one the right foot with Defendant, he could simply have told her that he was planning to educate her in lieu of ticketing her. That would certainly have alleviated some of the tension implicit between an officer and a driver during any traffic stop.

[5]During the suppression hearing, Jacks admitted that he was aware of the Ohio Patrol regulation requiring him to inform drivers of his reasons for stopping them, but, to his knowledge, the regulations do not require him to do so at any specific time.

> **Court:** Is there a requirement under your regulations or under any of your protocols that you are to advise the suspected violator of the traffic violation that prompted the stop?
> **Jacks:** You mean at any certain time?
> **Court:** Once you pull someone over, do you at some point in time have to tell them what

-14-

Jacks' failure to inform Defendant immediately about his reasons for stopping her gives the Court pause. As required by Highway Patrol Procedures, Jacks should have informed Defendant of his bases for the traffic stop as soon as he pulled her over. Just as he noted at the outset that he had stopped her because she was going fifty miles per hour, Jacks should have informed Defendant she had been following too closely, and improperly changed lanes. Instead, during the entire stop recorded on tape, Jacks *never* advised Defendant that the stop was predicated on any basis other than her slow speed, which did not violate any traffic law. In effect, Jacks stopped this Defendant for no basis supported in law or fact. The instances that initially triggered Jacks' suspicion – slow speed, hands on wheel at "ten and two," and failure to look at police – are all *legal* traffic maneuvers. And the bases for the stop – following too closely, and improper lane change – are belied by the objective evidence. There was no colorable basis for the stop.

In this case, where further investigation resulted in the seizure of over 755 grams of cocaine, Jacks' alleged "reasons" for stopping Defendant – the "suspicious behavior," and the traffic violations – could be mere post-hoc rationalizations to prevent the suppression of the evidence. *See, e.g., United States v. Robinson*, 414 U.S. 218, 221, n.1 (1973) (noting the possibility that police may

---

traffic law or rule they have violated that prompted the stop?
**Jacks:** Yes.
**Court:** At what point are you required to advise the suspect of the traffic violation that prompted the stop
**Jacks:** I don't think there is any policy that says when we have to. I normally try to tell the person pretty – immediately after the stop. In this particular case, things kind of took off in a different direction while I was trying to evaluate everything, and I didn't get it out.

See Hrg. Tr. at 84-85. Though Jacks contends that he educated Defendant once they arrived at the post, aside from his suspect testimony, he has provided the Court with no proof of his assertions.

-15-

be tempted to use commonly occurring traffic violations as means of investigating violations of other laws). Thus, based on Jacks' conflicting testimony, the Court finds that Jacks has not met his burden of showing that he had probable cause to stop Defendant.

The Court is aware of the gravity of the drug-related crime with which Defendant has been charged, but can, under no circumstances, condone the use of a Constitutional violation to pursue a conviction. Thus, because the traffic stop violated Defendant's Fourth Amendment rights, all evidence obtained as a result of that stop must be excluded as the "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471 (1963).

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Suppress.

**IT IS SO ORDERED.**

ALGENON L. MARBLEY
UNITED STATES DISTRICT JUDGE

**DATED: August 18, 2006**